**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**WICHITA FALLS DIVISION**

| | | |
|---|---|---|
| **LISA B.  CORRALES,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No.  7:11-CV-0142-O (BF)** |
| | § | |
| **MICHAEL J. ASTRUE,** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

This is an appeal from the decision of the Commissioner of the Social Security Administration ("the Commissioner") denying the claim of Lisa B. Corrales ("Plaintiff") for Disability Insurance Benefits ("DIB") under  Title II and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act (the "Act").  The Court considered Plaintiff's Brief, Defendant's Brief, and Plaintiff's Reply Brief.  The Court reviewed the record in connection with the pleadings.  The Court recommends that the Commissioner's decision be reversed and remanded for further proceedings at Step 2 of the sequential process.

### Background[1]

Plaintiff applied for benefits effective September 1, 2009, alleging that she had been disabled since May 31, 2009. (Tr. 127, 135.)   Plaintiff's claims were denied initially and upon reconsideration. (Tr. 23-54.) Plaintiff requested an administrative hearing, and on November 30, 2010, Administrative Law Judge ("ALJ") Lance K. Hiltbrand conducted a hearing.  (*Id.*)  On

---

[1] The background facts are taken from the transcript of the administrative proceedings, which is designated as "Tr."

February 3, 2011, the ALJ found that Plaintiff had not been under a disability within the meaning

of the Act from May 31, 2009, through February 3, 2011. (Tr. 7-22.)  Plaintiff requested review of

the ALJ's decision by the Appeals Council ("AC"), but on October 6, 2011, the AC denied

Plaintiff's request and adopted the ALJ's decision as Defendant's final administrative decision. (Tr.

1-5.)  Plaintiff then filed this civil action against the Commissioner under the authority in 42 U.S.C.

§ 405.

### Plaintiff's Age, Education and Work Experience

Plaintiff was born on February 28, 1964. (Tr. 127.)  She was 45 years old when she allegedly

became disabled and when she applied for benefits.  She was 46 at the time of the hearing.  Plaintiff

attended special education classes throughout her school years, and she completed the 10th or 11th

grade. (Tr. 28-29, 161.)   According to the testimony of the vocational expert ("VE") at the hearing,

Plaintiff's past work experience included jobs entitled "stocker" (exertionally medium and

unskilled); "nurse aide" (exertionally light or medium and semi-skilled); and "housekeeper/janitor"

(exertionally light or medium and unskilled).  (Tr. 51.)

### Relevant Medical Evidence

### Comprehensive Psychological Evaluation by Richard Kownacki, Ph.D

Before Plaintiff's alleged date of onset of disability, she went to the Texas vocational

rehabilitation agency called DARS for assistance in obtaining employment.  DARS referred Plaintiff

to Richard Kownacki, Ph.D., who performed a comprehensive psychological evaluation.  (Tr.

205-208.)  Plaintiff told Dr. Kownacki that she had been enrolled in special education during school.

Dr. Kownacki observed that "she seemed to give her best effort throughout the evaluation," and that

he believed the test result were accurate. (*Id.*)  Dr. Kownacki assessed Plaintiff's motivation level

2

as good.  She was on time for her scheduled appointment, fully cooperative, suitably dressed for a typical job interview, and receptive to his recommendations.  (*Id*.)  He felt Plaintiff had the ability to follow through with the treatment program.  (*Id*.)  Dr. Kownacki's diagnoses were "Major Depressive Disorder, Recurring, Severe" and "Mild Mental Retardation-Provisional."  (*Id.*)  Dr. Kownacki  assigned Plaintiff current and past-year-maximum Global Assessment of Functioning ("GAF") ratings of 50.[2]

Dr.  Kownacki evaluated Plaintiff after he administered IQ Testing, the MMPI-2, and the Beck Anxiety Scales.  (*Id.*)  On IQ testing on the WAIS-III, Plaintiff obtained a verbal IQ of 66, a performance IQ of 68, and a full scale IQ of 64.  Finding a lack of compelling evidence for Mental Retardation functioning prior to age 18, Dr. Kownacki indicated a provisional diagnosis of Mild Mental Retardation.  (*Id*.)  Observing that standard scores on the WRAT-3 were somewhat above the Mental Retardation range at a 6th-grade reading level, a 5th-grade spelling level, and a 5th-grade arithmetic level, Dr. Kownacki noted that the WRAT-3 tends to overestimate intellectual ability. (*Id*.)  Dr. Kownacki found that on personality testing by means of the MMPI-2, Plaintiff's validity scales were characterized by extreme over-reporting of symptoms.  (*Id*.)  He attributed this, in part, to  low cognitive functioning, but also to "a perception of extreme emotional distress combined with a genuine desire for help."  (*Id*.)

Dr.  Kownacki stated that the clinical scales of the MMPI-2 indicated very high levels of depression and anxiety, which was also supported by the Beck instruments.  (*Id*.)  He found

---

[2]  GAF is a standard measurement of an individual's overall functioning level "with respect only to psychological, social, and occupational functioning."  Diagnostic and Statistical Manual of Mental Disorders (Fourth Ed. 2000) ("DSM-IV-TR") at 32.  A GAF rating of 41-50 indicates: "Serious symptoms... OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  *Id.* at 34.

indications of a strong sense of social alienation and problems with social anxiety.  (*Id.*)  Dr. Kownacki diagnosed Plaintiff's major problems as depression and reduced cognitive functioning. (*Id.*)

In Dr. Kownacki's prognosis, he concluded that the testing showed Plaintiff had cognitive limitations, weak academic abilities, and severe depression, and that these were a significant barrier to employment.  (*Id.*)  However, he felt the barrier could be reduced with successful treatment and intervention and recommended mental health treatment which, in his opinion, would "certainly enhance her employability."  (*Id.*)  With respect to vocational functioning, the test results suggested that she would be best suited for some type of unskilled or semi-skilled work, similar to what she had done in the past.  (*Id.*)  He ruled out further education due to her low academic abilities, but found that the testing indicated she had relative strength in the ability to maintain attention and concentration, suggesting the ability to perform simple and repetitive tasks that required sustained focus.  (*Id.*)

### Counseling with Bonnie L.  Horschler, M.A., LPC

Plaintiff underwent mental health counseling with Bonnie L. Horschler, M.A., LPC.  The counseling continued from September 17, 2004, to March 2, 2005.  (Tr. 209-220.)  Horschler noted in the initial session that in March 2004, Plaintiff had quit her night-shift job at Walmart that she had held for 17 months due to the care of her six children, three of whom (ages 11, 10, and 9) lived at home.  Plaintiff reported that after she quit her job, things "went downhill."  (Tr.  209.)  Plaintiff reported depression, tearfulness, anhedonia, guilt, reduction in social functioning, feelings of worthlessness, decreased libido, terminal insomnia, increased appetite, a weight gain of 30 pounds in six months, anxiety, and fatigue.  (*Id.*)  Horschler suggested Plaintiff get another psychiatric

evaluation.  (Tr.  210.)  Plaintiff scheduled an appointment with MHMR for November 2004.  On October 29, 2004, Plaintiff reported that she  obtained a job at Sheppard Air Force Base through DARS.  Plaintiff continued counseling for her  problems at work, but on January 10, 2005, Plaintiff quit her job at the base.  Horschler reported that Plaintiff stated "I  regret that. . . I keep doing this in all my jobs. . . I can't stop thinking negatively."  (Tr. 217.)

### Sabeen Koreshi, M.D

About a month after Plaintiff's alleged onset date, on June 25, 2009, Plaintiff went to the Wichita Falls Community Healthcare Clinic, stating that she had "a lot of anxiety and depression and a feeling like she is always mad at everyone." Sabeen Koreshi, M.D., started her on Klonopin (usually prescribed for seizures or panic attacks), noting that once her blood pressure was under control, he might prescribe an antidepressant. (Tr. 228.)  On June 30, 2009, Dr. Koreshi saw her again, and Plaintiff stated that she felt "a whole lot better."  (Tr. 226.)  On July 16, 2009, when Plaintiff told Dr. Koreshi that the Klonopin was "making her very sleepy and she just [felt] like sleeping all the time," he reduced the dosage. (Tr. 224.)  On August 6, 2009, Plaintiff again said she felt "a whole lot better," but wanted to start something for her anxiety and depression besides the Klonopin.   Dr. Koreshi continued the Klonopin and prescribed Zoloft, as well.  (Tr. 222.)  On September 3, 2009, when Plaintiff returned, Dr. Koreshi noted that Plaintiff's "depression and anxiety was in control with Zoloft," but he increased the Zoloft dosage to 50 mg per day (Tr. 374). On October 2, 2009, Dr. Koreshi noted that, "Increasing the dose of Zoloft has helped her a lot."  Dr. Koreshi continued the higher dosage.  (Tr. 377.)

### Second Evaluation by Dr. Kownacki

On October 20, 2009, Plaintiff underwent a second psychological evaluation by Dr. Kownacki who was acting as a consultative examiner for Defendant on referral from the Texas state disability determination agency.  (Tr. 256-258.)  Plaintiff told Dr. Kownacki that she was taking Zoloft and Klonopin, and that she was receiving counseling and medication management through the Helen Farabee Center ("HFC"), a public mental health facility.  (*Id*.)  Plaintiff related that she had last worked for about four months at Senior Care through May of 2009.  She left that job because of arguing with the staff and because she felt they were always talking about her.  (*Id*.)

 Dr. Kownacki again noted that Plaintiff had been enrolled in special education courses in school and that his July 2004 evaluation had included a WAIS-III where the Full Scale IQ was 64 or 1st percentile, in the mild range of mental retardation.  Dr.  Kownacki indicated a provisional diagnosis mild mental retardation.  (*Id*.)  Plaintiff's academic abilities were  essentially at an elementary school level.  (*Id*.)

On mental status examination, Dr. Kownacki noted Plaintiff to be "slow and unsteady on her feet."  (*Id*.)  When Plaintiff was seated, she was generally restless.  (*Id*.)  Her mood was dysphoric and her  affect was blunted, but she laughed when Dr.  Kownacki prompted her with humorous material. (*Id*.)  Although Plaintiff's short-term memory was "intact," her "attention and concentration were poor.  She was distractible. She had trouble spelling the word 'world' backwards and she could not perform serial 7's."  Her judgment and insight were "fair."  Dr. Kownacki's diagnostic impressions were "Major Depressive Disorder, Recurring, Severe," "Generalized Anxiety Disorder," "Personality Disorder NOS (Borderline, Paranoid, and Cluster-B Type)," and "Mental Retardation,

Mild - Provisional, Per Prior Testing." (*Id.*)  Dr.  Kownacki again assigned Plaintiff's current and past-year-maximum GAF ratings at 50.  (*Id.*)

### Jeffrey S. Seward, M.D., Psychiatrist

On January 20, 2010, Plaintiff saw Jeffrey S. Seward, M.D., a psychiatrist at the HFC. Plaintiff complained of "depression, anxiety, and increased irritability" and stated that she was out of the Klonopin prescribed by Dr. Koreshi.  (Tr. 339-340.)  Dr. Seward further noted: "She believes that the Wellbutrin is increasing her irritability. It could be that the Zoloft was working better for her irritability and it could be that the fact that she is out of Klonopin makes her more irritable. In any event she wants a medication change." (*Id.*)  On a 1-10 "overall functioning" estimate, Dr. Seward assigned a "5-6." (*Id.*)  On mental status exam, Dr.  Seward's findings were unremarkable except for a "mildly depressed" mood.  (*Id.*)  Dr. Seward discontinued Wellbutrin and substituted Lexapro "for depression and anxiety" and  advised Plaintiff to continue getting her Klonopin from Dr. Koreshi.  (Tr. 335-336.)  On March 22, 2010, Plaintiff returned to the HFC; Dr. Seward rated her at a "6-7" on the 1-10 "overall functioning" scale, and noted that she said that the Lexapro was working well for her depression.  She explained that she was having difficulty seeing Dr. Koreshi and asked Dr. Seward to take over prescribing the Klonopin.  Dr.  Seward prescribed Klonopin and continued the Lexapro.   Dr.  Seward's "mental status findings" for Plaintiff were unremarkable. (*Id.*)

### Dr. Koreshi

On June 10, 2010, Plaintiff saw Dr. Koreshi again; she stated that she was still taking the Klonopin, but that "she went to MHMR and they started her on some Lexapro instead of the Zoloft." Plaintiff explained that she had not taken Lexapro for about a month because she missed several

appointments at MHMR, and MHMR dismissed her.  Dr. Koreshi continued the Klonopin and Lexapro.  (Tr. 387-388.)

## Consultative Examination by Leon Morris, Ed.D.

On June 25, 2010, Leon Morris, Ed.D., acting as a consultative examiner for Defendant, gave Plaintiff another psychological evaluation.  He noted that Plaintiff had completed eleventh grade (special education) and stated that although she was "superficially cooperative throughout the examination, she appeared to exhibit credibility problems during testing." (Tr. 288-293.)  For example, on Part B of the Halstead-Reitan Trail-Making Tests, she appeared to learn the concept involved rapidly, but she made errors at the end of the test instead of at the beginning.  (*Id*.) Similarly, on the Wechsler Memory Scale-IV Verbal Paired Associates subtests, she appeared to free associate to the items instead of trying to remember them, and, instead of improving her performance with practice, her performance actually deteriorated.  (*Id*.) However, during the Recognition portion of this subtest, it became obvious that she had learned most of the word pairs. (*Id*.)  Additionally, "she appeared to score somewhat below her potential on some of the tests because she often answered 'I don't know' without actually trying to answer the questions."(*Id*.) Dr. Morris noted that Plaintiff's "approach to objective personality testing [presumably referring to the MMPI he administered] was highly consistent, indicating that she was able to understand the test items, but she appears to have greatly overstated or fabricated symptoms of mental disorders, and testing appears to be indicative of malingering."  (*Id*.)

Dr. Morris referred to Dr. Kownacki's observation of "extreme over-reporting of symptoms" on his July 2004 testing.  (*Id*.) On the WAIS-III, Plaintiff obtained a full-scale IQ of 66.  This is in the 1st percentile; however, Dr. Morris questioned the validity of Plaintiff's scores on the WAIS-III,

as well as those she obtained on the WRAT-3 (5th-grade reading level, 4th-grade spelling level, and 4th-grade arithmetic level).  (*Id.*)  Dr.  Morris noted that "in view of the previously mentioned malingering," Plaintiff's WRAT-3 scores had each been a grade higher upon Dr. Kownacki's testing in July 2004.  (*Id.*)  On mental status examination, his findings were  unremarkable except for "below  average" overall memory and abstract reasoning, both of which he also questioned on the same basis.  (*Id.*)  Dr. Morris' diagnostic impressions were "Malingering," "Cannabis-related Disorder, not otherwise specified," and "Personality Disorder, not otherwise specified." (*Id.*)

### Dr. Koreshi

On September 16, 2010, Plaintiff went to Dr. Koreshi again.   (Tr. 403.)  She reported that at nighttime, her hands bothered her a lot.  She said that her right hand was worse than the left one. She said her hands went "to sleep" and she had to shake them multiple times to get the feeling to return to them.  (*Id.*)  On examination, he noted positive Tinel's and Phalen's signs.  (*Id.*)  He noted an impression of "bilateral hand numbness with discomfort-likely carpal tunnel." (*Id.*)  Dr. Koreshi advised her to wear wrist splints for most of the day and during the night.  (*Id.*)  He planned a referral for EMG studies.  (*Id.*)  He characterized her anxiety and depression as "stable."  (*Id.*)

### Eugene Pak, M.D., Neurologist

On October 7, 2010, Plaintiff was evaluated by Eugene Pak, M.D., a neurologist, on referral from Dr. Koreshi.  (Tr. 410-11.)  Plaintiff complained that, for about two years, she had numbness, tingling, and cramping of her hands which grew worse with activity.  (*Id.*)  She said she especially felt these symptoms when driving  a car and felt better when she rested her arms.  (*Id.*)  Plaintiff told Dr. Pak that the pain was significant enough that she would like to have medication to treat it.  (*Id.*) On examination, Dr. Pak found positive Tinel's signs at the wrist at the median nerves bilaterally.

(*Id.*) His diagnostic impression was "Bilateral carpal tunnel syndrome, right likely worse than the left side," and  planned an EMG study the following week.  (*Id.*)  He started Plaintiff on Gabapentin twice a day.

### The Hearing

### Vocational Expert Testimony

The ALJ posed an initial hypothetical question to the VE, describing an individual with "the same age, education and work experience as the claimant" who could "occasionally lift and carry objects no more than 20 pounds, frequently lift and carry objects up to 10 pounds, stand and/or walk with normal breaks six hours in an eight hour work day and sit with normal breaks for a total of six hours in an eight hour work day. . . ."  (Tr. 52-53.)  The person would have the ability to understand, remember and carry out simple instructions, interact appropriately with others at a superficial level but not necessarily the general public, and could adapt to a work situation.  (*Id.*)  The hypothetical person's living activities would be rated as mild, difficulties in maintaining social function would be moderate, and the individual's deficiencies in concentration, persistence and pace also would be moderate.  (*Id.*)

The VE responded that such a hypothetical person could not perform any of Plaintiff's past work, but could perform the following jobs: "electronics worker" (Dictionary of Occupational Titles ("DOT") code 726.687-010); "press operator" (DOT code 363.685-010); and "laundry folder" (DOT code 369.687-018), all exertionally light and unskilled jobs.

Plaintiff's counsel asked the VE to add to the ALJ's hypothetical question the following limitation: The person would have trouble accepting instruction and criticism from a supervisor, even to the extent that cross words would be spoken and the individual might even leave the work

site "in a huff."  (Tr. 53.)  The VE replied that as a general rule that is not an acceptable work habit.

(*Id*.)  Counsel then asked the VE to add to the ALJ's hypothetical question an alternative limitation:

At unpredictable times during the work week, the person would have days when she was scheduled

to work but just couldn't make it to work.  (*Id*.)  The VE replied, that absenteeism in unskilled work

is not tolerated very well.  (*Id*.)  Counsel then asked the VE about an individual who was frequently

10 to 15 minutes late for work.  (*Id*.)  The VE replied that tardiness would have the same effect.  (Tr.

54.)  Counsel then asked whether there would be any impact if the individual had a full scale IQ of

64.  (*Id*.)  The VE answered that he did not think that would fit in the hypothetical.  (*Id*.)

### Plaintiff's Testimony

In pertinent part, Plaintiff stated that she was in special education classes for "learning

disability."  (Tr. 29.)  She explained that she could not comprehend or "get into it."  She said she

could perform subtraction and division, but doing so would take her a long time.  (*Id*.)  Plaintiff

testified that she liked her last job as a nurse aide when she was doing her work and no one bothered

her.  (Tr. 35.)  She did not like it when someone interfered with what she was doing.  (*Id*.)  She

claimed she became "bent out of shape," would begin arguing, and would end up "all out of whack."

(*Id*.)  She explained that "for some dumb reason," she could not get along with people.  (*Id*.)   She

was not comfortable being around too many people.  (*Id*.)   She felt there were too many rules and

said that people would tell her something and then the boss would come in and tell her something

totally different.  (*Id*.)

With respect to her daily routine, Plaintiff stated she arose about 5:00 A.M. and waited for

her kids to get up and get ready for school.  (Tr. 39.)  She would then "see them out the door." (*Id*.)

Plaintiff testified that because of the effect of her medications, she would go back to sleep until

about 10:00 A.M.  (*Id*.)  When she got up again, she did nothing but stay in her room because she did not like to have visitors.  (*Id*.)  Her children arrived home about 3:30 P.M.  (*Id*.)

With respect to housework, Plaintiff said that her children did the laundry, that she did not make the beds, and that the family used paper plates.  Plaintiff cleaned only the bathrooms and other places she felt a need for sanitation.  (Tr. 40.)  She and her children did the cooking together, and they walked to Walmart to do grocery shopping.  (Tr. 44.)

When questioned about her interests or hobbies, Plaintiff stated she was "trying to get into reading" and went to church on Sundays with her brother.  (*Id*.)  She explained that she had bought a book but fell asleep when reading.  (Tr. 45-46.)  When asked whether she was comprehending the book, Plaintiff stated, "Uh-uh. I'm trying to [sic] that's why I keep reading the same thing over and over, to get it. . . I just need to try something and I figured I'd start with a book."  (Tr. 45.)

Plaintiff described her past work situations and her feelings that she was uncomfortable and did not "fit in."  (Tr. 46-47.)  She said that she felt as if she was not smart enough to be at work and explained she was always assigned the dirty work because she was "the peon."  (*Id*.)  She felt "this little" but recognized it was no one's fault.  She said, "It's hard to get along with people."  (*Id*.)  Plaintiff noted that the longest she had held a job was for about 17 months at Walmart in 2002 or 2004.  (*Id*.)  She thought she was doing better then.  (*Id*.)  She explained that she had a car, a job, and a house, "like normal people do."  (Tr. 47.)  She characterized her overall pattern as "like an up and down thing. . . I'm good, no I'm not, yes, I am. . . it's hard to be me."  (Tr. 48.)

**The ALJ's Decision**

The ALJ utilized the five-step, sequential evaluation process to find Plaintiff not disabled under the Act. (Tr. 10-18.)  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).[3]  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of May 31, 2009.  (Tr. 12, Finding 2.)  At step two, the ALJ found that Plaintiff had the following "severe" impairments: major depressive disorder and generalized anxiety disorder.  (Tr. 12, Finding 3.)  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled an Appendix 1 listed impairment for presumptive disability under the regulations. (Tr. 13, Finding 4.) Next, the ALJ determined that Plaintiff's subjective complaints were not credible.  (Tr. 15-16.)

The ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform less than a full range of light work ;[4] lifting and carrying 20 pounds occasionally and 10 pounds frequently; and standing, walking, and sitting six hours out of an eight-hour workday.  (Tr. 15, Finding 5.)  Additionally, with respect to mental limitations, the ALJ limited Plaintiff to jobs requiring understanding, remembering, and carrying out simple instructions.  *(Id.)*  Further, the ALJ

---

[3] The five steps are: (1) Is the claimant performing substantial gainful activity?  (2) Does the claimant have a severe impairment?  (3) Does the impairment meet or equal a listed impairment? (4) Does the impairment prevent the claimant from doing past relevant work?  (5) Does the impairment prevent the claimant from doing any other work?

[4] Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. §§ 404.1567(b), 416.967(b).

found Plaintiff could interact with coworkers and supervisors at a superficial level, but must avoid interacting with the public. *(Id.)* Also, the ALJ found Plaintiff could adapt to changes in the workplace. *(Id.)* At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. 17, Finding 6.) At step five, with the assistance of VE testimony, the ALJ found that Plaintiff was capable of performing a significant number of jobs in the local and national economies. (Tr. 17, Finding 10.) Specifically, the ALJ found Plaintiff could perform the jobs of electronic worker, with 100,000 jobs in the national economy and 45,000 jobs statewide; laundry press operator, with 40,000 jobs in the national economy and 2,000 jobs statewide; and laundry folder, with 75,000 jobs in the national economy and 2,500 jobs statewide. (Tr. 18.) Therefore, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act from May 31, 2009, her alleged disability onset date, through February 3, 2011, the date of the ALJ's decision. (Tr. 28, Finding 11.)

## **STANDARD OF REVIEW**

A claimant must prove that she is disabled for purposes of the Social Security Act to be entitled to social security benefits. *Leggett v. Chater*, 67 F.3d 558, 563-64 (5th Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Act is "the inability to engage in any substantial gainful activity by reason of any medically-determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled. Those steps are that:

(1)    an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings;

(2)    an individual who does not have a "severe impairment" will not be found to be disabled;

(3)    an individual who meets or equals a listed impairment in Appendix 1 of the regulations will be considered disabled without consideration of vocational factors;

(4)    if an individual is capable of performing the work the individual has done in the past, a finding of "not disabled" will be made; and

(5)    if an individual's impairment precludes the individual from performing the work the individual has done in the past, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed.

*Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citing *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990) (paraphrasing 20 C.F.R. § 404.1520(b)-(f)).

The burden of proof lies with the claimant to prove disability under the first four steps of the five-step inquiry. *Leggett*, 67 F.3d at 564. The burden of proof shifts to the Commissioner at step five of the inquiry to prove that other work, aside from the claimant's past work, can be performed by the claimant. *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994) (citing *Anderson v. Sullivan*, 887 F.2d 630, 632-33 (5th Cir. 1989)). If the Commissioner demonstrates that other jobs are available to the claimant, the burden of proof shifts back to the claimant to rebut such a finding. *Selders v. Sullivan* , 914 F.2d 614, 618 (5th Cir. 1990).

The Commissioner's determination is afforded great deference. *Leggett*, 67 F.3d at 564. Judicial review of the Commissioner's findings is limited to whether the decision to deny benefits was supported by substantial evidence and to whether the proper legal standard was utilized. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C.A. § 405(g). Substantial evidence

is defined as "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett*, 67 F.3d at 564.  The reviewing court does not re-weigh the evidence, retry the issues, or substitute its own judgment, but rather scrutinizes the record to determine whether substantial evidence is present.  *Greenspan*, 38 F.3d at 236.

### Issues

1.    Whether reversal and remand is required because the ALJ failed to utilize the proper severity standard at step two of the sequential evaluation process; and

2.    Whether the ALJ's finding at step two that Plaintiff's mental retardation is non-severe is supported by substantial evidence.

### Analysis

Plaintiff contends that the ALJ committed legal error at Step 2 by failing to use the required severity standard set out in *Stone v. Heckler*, 752 F.2d 1099, 1104-05 (5th Cir. 1985), requiring reversal and remand.  The Commissioner responds that the ALJ did not err because he cited Social Security Ruling (SSR) 96-3p and SSR 85-28.

In setting forth the "Applicable Law," the ALJ defined "severe" and "not severe" impairments:

> An impairment or combination of impairments is 'severe' within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. An impairment or combination of impairments is 'not severe' when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work [citations omitted].

(Tr. 11, paragraph 3.) Here, the ALJ expressly found only two severe impairments, major depressive disorder and generalized anxiety disorder, again reiterating that these two impairments, "in

16

combination if not singly, significantly affected Plaintiff's ability to perform basic work activities"
[citations omitted] while noting that the claimant's impairments and related symptoms do not
prevent all work activity.  (Tr. 12, penultimate paragraph.)  The ALJ found Plaintiff's hypertension,
mental retardation, and obesity to be non-severe, stating that they did not more than minimally affect
Plaintiff's abilities to perform work-related functions and thus were not severe.  (*Id.*, last paragraph,
Tr. 13, first three paragraphs).

In this case, the ALJ did not show that he actually applied either *Stone* or the construction
the Fifth Circuit gives to 20 C.F.R. § 1520(c), in evaluating Plaintiff's impairments.  (Tr. 16.)  The
standards the ALJ applied were that an impairment was "non-severe" if it did not "significantly
limit," "significantly affect," and/or "more than minimally affect" such ability.  The Court finds that
the standard used by the ALJ created ambiguity.  *Craaybeek v. Astrue*, No. 7:10-CV-054-BK, 2011
WL 539132 at *6 (N.D. Tex.  Feb.  7, 2011) ("express recitation of a standard inconsistent with the
*Stone* standard creates an ambiguity and this ambiguity regarding whether the correct legal standard
was used must be resolved at the administrative level").

Contrary to Respondent's argument, the ALJ's referral to applicable social security
regulations and rulings, including 20 C.F.R. § 1520(c); 416.920(c), 404.1520(c); 1416,921(c)
416.920(c), 20 C.F.R. § 416.921, SSR 85–28, SSR 96–3p, and SSR 96–3p, and 96-4(p) does not
substitute as a proper construction of the *Stone* standard.  *See, e.g. Brown v.  Astrue*,
No. 3:11–CV–0475–BD, 2012 WL 652034 at *3 (N.D. Tex. Feb.  29, 2012); *Lederman v. Astrue*,
829 F. Supp. 2d 531, 539 (5th Cir. 2011); *Jones v. Astrue,* 821 F. Supp. 2d 842, 850 (5th Cir. 2011);
*Garcia v. Astrue,* No. 3:08–CV–1881–BD, 2010 WL 304241 at *3 (N.D. Tex. Jan. 26, 2010).  The
"more than minimal effect on an individual's ability to work" definition that the ALJ used in this

case is not the standard set forth in *Stone*.  In the Fifth Circuit, the appropriate legal standard for

determining whether a claimant's impairment is severe is *de minimis*:

> [A]n impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.

*Stone,* 752 F.2d at 1101 (quoting *Estran v. Heckler*, 745 F.2d 340, 341 (5th Cir. 1984) and citing

*Davis v. Heckler*, 748 F.2d 293, 296 (5th Cir. 1984); *Martin v. Heckler*, 748 F.2d 1027, 1032 (5th

Cir. 1984)).  *See Loza* v. Apfel, 219 F.3d 378, 391 (5th Cir. 2000).  Unlike the standard that the ALJ

applied, *Stone* provides no allowance for minimal interference on a claimant's ability to work.

Although this court has recognized that the difference between the two statements may appear to be

slight, the ALJ's construction is not an express statement of the *Stone* standard nor an acceptable

equivalent.  The United States District Court for the Northern District of Texas is consistent in its

refusal to find that the standard which the ALJ applied in this case is the standard set forth in *Stone*.

*See  Sanders v. Astrue*, No. 3:07–CV–1827–G (BH), 2008 WL 4211146 at *7 (N.D. Tex. Sept. 12,

2008); *Scroggins v. Astrue*, No. 3:08–CV–1444–L (BH), 2009 WL 192875 at *5 (N.D. Tex.

Dec. 23, 2008), *rec. accepted*, 598 F. Supp. 2d 800, 806-07 (N.D.Tex.  Jan.  27, 2009).

The Commissioner contends that even if the ALJ applied an incorrect severity standard,

remand is not proper here because the ALJ proceeded beyond step two of the sequential evaluation

process.  In other words, the Commissioner would treat the error as a procedural error where remand

is not required unless a claimant demonstrates prejudice.  As the Court correctly points out in *Brown*,

at *4, courts in this circuit have no discretion to determine whether such an error is harmless.  *See*

*Scroggins,* 598 F. Supp. 2d at 806–07.  "Unless the correct standard is used, the claim *must* be

remanded to the Secretary for reconsideration." *Stone,* 752 F.2d at 1106 (emphasis added); *see also Varela v. Astrue,* No. 4:11- CV- 0232-Y, 2012 WL 473761 at * 5 n. 2 (N.D. Tex. Jan. 4, 2012), *rec. adopted,* 2012 WL 473918 (N.D.Tex. Feb.14, 2012) (collecting Northern District cases holding that failure to apply the *Stone* standard is legal error requiring reversal); *Adcock v. Astrue,* No. 3:10-CV-2257-BD, 2011 WL 5529555 at *4 (N.D.Tex. Nov.14, 2011) (remand required where the ALJ cited to *Stone,* but nonetheless applied incorrect standard); *Neal v. Comm'r of Soc. Sec. Admin.,* No. 3:09-CV-0522-N, 2009 WL 3856662 at *1 (N.D.Tex. Nov.16, 2009) (ambiguity as to whether proper legal standard was used in making severity determination must be resolved at the administrative level).

Plaintiff's impairments that the ALJ did not find severe were her hypertension, her mental retardation, and her obesity.  The difference between the *Stone* standard and that applied by the ALJ, coupled with the ALJ's failure to acknowledge the Fifth Circuit's interpretation of the regulation, constitutes the ALJ's application of an incorrect legal standard and requires reversal and remand for legal, rather than procedural, error.  *Sanders*, 2008 WL 4211146 at *7; *Scroggins*, 2009 WL 192875 at *5.  *See Rangel v. Astrue*, 605 F. Supp. 2d 840, 851 (W.D. Tex. 2009).  Reversal is required so that the Commissioner can apply the correct standard in determining the severity of all of Plaintiff's impairments under *Stone*, including Plaintiff's mental retardation.  Accordingly, because Plaintiff's mental retardation claim must be reevaluated under *Stone*, the Court need not reach Plaintiff's claim that "the ALJ's finding that Plaintiff's mental retardation was 'non-severe' is not supported by substantial evidence."

## **<u>RECOMMENDATION</u>**

The Court recommends that the case be reversed and remanded for further consideration of all the evidence beginning at Step 2 of the sequential evaluation process.

SO RECOMMENDED, December 5, 2012.


PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

The United States District Clerk shall serve a true copy of the Findings, Conclusions, and Recommendation on the parties.  Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions, and recommendation must serve and file written objections within 14 days after being served with a copy.  A party filing objections must specifically identify the part of the findings, conclusions, and recommendation to which an objection is being made.  The District Court need not consider frivolous, conclusory or general objections.  A party's failure to file such written objections shall bar that party from a *de novo* determination by the District Court.  *See Thomas v. Arn*, 474 U.S. 140, 150 (1985).  Additionally, any failure to file written objections within 14 days after being served with a copy of the Findings, Conclusions, and Recommendation shall bar the aggrieved party from appealing the legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error.  *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).